SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

**State v. Darius J. Carter (A-66-19) (083221)**
**State v. Miguel A. Roman-Rosado (A-67-19) (084074)**

**Argued April 27, 2021 -- Decided August 2, 2021**

**RABNER, C.J., writing for a unanimous Court.**

In recent years, more than 100,000 drivers annually have been ticketed for violating N.J.S.A. 39:3-33 (section 33), which includes a prohibition against "driv[ing] a motor vehicle which has a license plate frame . . . that conceals or otherwise obscures any part of any marking imprinted upon the vehicle's registration plate." The defendants in these consolidated appeals were stopped while driving. The stops were pretextual: officers stopped each defendant because part of their license plates were covered, but the purpose was to try to develop a criminal investigation. The police found contraband in both cases, which formed the grounds for defendants' convictions.

Defendants argue that if section 33 is read expansively, the statute is unconstitutionally vague and overly broad, and also invites discriminatory enforcement. The State opposes those arguments and relies in the alternative on Heien v. North Carolina, 574 U.S. 54 (2014), for the proposition that a stop and conviction based on an officer's reasonable but mistaken interpretation of the law should be upheld.

Defendant Darius Carter was stopped in September 2014. The words "Garden State" were covered on his car's license plate, and the basis for the stop was a suspected violation of section 33. Carter was driving without a license, and the police learned that he had two outstanding arrest warrants. The police arrested Carter and later found heroin and a small amount of cocaine on him. Carter moved to suppress the drugs seized. The parties did not dispute that a license plate frame covered the words "Garden State" on the plate, and neither party argued that any other part of the plate was covered.

The trial court denied the motion to suppress, concluding the stop was pretextual but that the law unambiguously barred concealing any markings on a license plate, not just the plate's registration numbers. The Appellate Division affirmed, finding that the statute's plain language "expressly prohibits even the partial concealment of any marking on the license plate," including the words "Garden State."

1

In April 2016, a police officer stopped the car Miguel Roman-Rosado was driving. The officer testified he "was on a proactive detail" -- "stop[ping] a lot of cars for motor vehicle infractions and . . . then try[ing to] develop criminal investigations from that." While driving right behind Roman-Rosado, the officer noticed a bracket around the rear license plate that covered about ten or fifteen percent of the words "Garden State." The officer stopped the car based on a suspected violation of section 33 and learned that Roman-Rosado had two outstanding arrest warrants. After spotting a garment wrapped around something bulky, the officer found an unloaded handgun. Roman-Rosado moved to suppress the gun as the fruit of an unlawful stop.

The trial court denied the motion. The court acknowledged there were minimal obstructions on the plate -- a portion of the bottom of "Garden State" as well as the top of the "N" and the "J" in New Jersey -- but found that the statute barred the "obstruction of any marking on the" plate. The Appellate Division reversed, finding that the plate's markings were not concealed or obscured within the meaning of the statute. 462 N.J. Super. 183, 190 (App. Div. 2020). The court found that there was no reasonable basis for the police to stop Roman-Rosado's car, that the subsequent search of the car was unconstitutional, and that the handgun should have been suppressed. Id. at 199-200.

The Court granted certification. 241 N.J. 498 (2020); 241 N.J. 501 (2020).

**HELD:**     *To avoid serious constitutional concerns, the Court interprets the statute narrowly and holds that N.J.S.A. 39:3-33 requires that all markings on a license plate be legible or identifiable. If a frame conceals or obscures a marking in a way that it cannot reasonably be identified or discerned, the driver would be in violation of the law. In practice, if a registration letter or number is not legible, the statute would apply; but if a phrase like "Garden State" is partly covered but still recognizable, there would be no violation.

*Under that standard, defendant Darius Carter's license plate frame, which covered the phrase "Garden State" entirely, violated the law, so the stop was lawful. In contrast, defendant Miguel Roman-Rosado's plate frame did not cover "Garden State." It partially covered only ten or fifteen percent of the slogan, which was still fully legible, so the stop was unlawful.

*The Court declines to adopt the standard set forth in Heien under the New Jersey Constitution. The State Constitution is designed to protect individual rights, and it provides greater protection against unreasonable searches and seizures than the Fourth Amendment. Under Article I, Paragraph 7 of the State Constitution, it is simply not reasonable to restrict someone's liberty for behavior that no actual law condemns, even when an officer mistakenly, although reasonably, misinterprets the meaning of a statute. Because there was no lawful basis to stop Roman-Rosado, evidence seized as a direct result of the stop must be suppressed.

2

1.  The Court reviews the text of section 33 and notes that violations of that section carry a fine and imprisonment for failure to pay the fine. A related provision in Title 39 requires that the words "Garden State" "be imprinted" on license plates for passenger cars. N.J.S.A. 39:3-33.2. Yet other statutes authorize specialty plates, which do not contain the phrase "Garden State." A companion statute to section 33 addresses groups that supply license plate frames or holders and prohibits the distribution of merchandise "knowing that such merchandise is designed or intended to be used to conceal or degrade the legibility of any part of any marking imprinted upon a vehicle's license plate for the purpose of evading law enforcement." N.J.S.A. 39:3-33c (section 33c). The police issue more than 100,000 violation notices for section 33 in a year. Not a single violation notice was issued for section 33c from 2012 to 2019. (pp. 15-17)

2.  The Court reviews principles of statutory construction and the parties' arguments about the meaning of section 33. The State contends that the statute's words are clear: a license plate frame cannot cover any part of any marking on a license plate. Defendants stress that section 33 bars the use of license plate frames only insofar as they conceal or otherwise obscure certain markings. The Court notes first that the term "marking" in section 33 extends to any impressions on a license plate, not just the registration numbers and letters. But, after reviewing the ordinary definitions of the key terms of section 33 -- "conceal" and "obscure" -- the Court understands those terms to focus on legibility, not on every minor covering of otherwise recognizable markings. Reading the statute in that way avoids absurd results and comports with the view that the Legislature "writes motor-vehicle laws in language that can be easily grasped by the public so that every motorist can obey the rules of the road." State v. Scriven, 226 N.J. 20, 34 (2016). (pp. 17-22)

3.  Noting that section 33 -- unlike section 33c -- does not expressly include language about legibility, the Court considers the statute's legislative history. That history sheds little light on the scope of the provision at issue here or the meaning of its key terms, but amendments to other portions of N.J.S.A. 39:3-33 reflect the Legislature's concern about the legibility of license plates. (pp. 22-24)

4.  Defendants argue that a broad reading of section 33 does not pass constitutional muster. They argue that a law that criminalizes de minimis obstructions of phrases like "Garden State" fails under the permissive rational basis test. They contend as well that the statute, as interpreted by the State, is both unconstitutionally vague and overly broad. Vague laws are constitutionally deficient under principles of procedural due process because they leave people guessing about their meaning and do not provide fair notice of conduct that is forbidden. Overly broad statutes suffer from a different flaw, one that rests on principles of substantive due process: they invite excessive governmental intrusion into protected areas by extending too far. Rather than strike down a law as unconstitutional, however, if the "statute is 'reasonably susceptible' to an interpretation that will render it constitutional," courts construe the law narrowly to remove any doubts about its constitutional validity. State v. Burkert, 231 N.J. 257, 277 (2017). (pp. 24-26)

3

5.  The Court agrees that section 33, if read broadly, raises serious constitutional concerns.  Roman-Rosado was stopped for a license plate frame that covered ten to fifteen percent of the bottom of the phrase "Garden State."  But the words, like the rest of the markings on the plate, were fully recognizable.  Most people would have no idea that section 33 might apply in such a situation.  If the proposed broad reading of section 33 were the standard, tens if not hundreds of thousands of New Jersey drivers would be in violation of the law.  Further, limitless discretion can invite pretextual stops, like the stops in both cases here.  It can also lead to arbitrary and discriminatory enforcement.  It is cause for concern, as well, that despite the State's frequent use of section 33 to stop drivers, no summonses were issued under section 33c from 2012 through 2019.  Law enforcement commonly attacks problems at their source, yet here, rather than take any action against the source of the offending frames, motorists by the thousands are pulled over each year.  To the extent section 33 has two meanings -- a narrow one that focuses on whether a license plate is legible, and a broader one that raises serious constitutional issues -- the doctrine of constitutional avoidance calls for a narrow interpretation.  State v. Pomianek, 221 N.J. 66, 90-91 (2015).  (pp. 26-29)

6.  The Court holds that section 33 requires that all markings on a license plate be legible or identifiable.  That interpretation is consistent with the plain meaning of the statute's wording.  If a license plate frame or holder conceals or obscures a marking such that a person cannot reasonably identify or discern the imprinted information, the driver would be in violation of the law.  In other words, a frame cannot cover any of the plate's features to the point that a person cannot reasonably identify a marking.  So, for example, if even a part of a single registration letter or number on a license plate is covered and not legible, the statute would apply because each of those characters is a separate marking.  If "Garden State," "New Jersey," or some other phrase is covered to the point that the phrase cannot be identified, the law would likewise apply.  But if those phrases were partly covered yet still recognizable, there would be no violation. When applying the above test, trial courts will be asked to evaluate whether license plate markings are legible or identifiable from the perspective of an objectively reasonable person.  That judgment can be based on still photos or videos.  (pp. 29-30)

7.  Applying the above test here, Roman-Rosado did not violate the statute.  In Carter's case, however, it is undisputed that "Garden State" was entirely covered.  As a result, the plate violated the statute, and law enforcement officers had the right to stop Carter.  The Court does not find persuasive Carter's argument that the statute violated his rights under the First Amendment by requiring him to display the state motto, "Garden State."  The case on which Carter bases his argument, Wooley v. Maynard, involved two components: (1) compelled speech by the government; and (2) content a party disagreed with.  See 430 U.S. 705, 715 (1977).  Unlike in Wooley, the record before this Court does not include any statement or certification that Carter disagrees with the expression "Garden State" or finds it "morally objectionable."  See ibid.  (pp. 30-33)

4

8. Because Roman-Rosado did not violate the statute, the Court evaluates the reasonable mistake of law doctrine. The Fourth Amendment and Article I, Paragraph 7 of the State Constitution guarantee individuals the right to be free from unreasonable searches and seizures. A motor-vehicle stop by the police constitutes a seizure and requires reasonable and articulable suspicion that the driver is committing a motor-vehicle violation or some other offense. The sole basis for Roman-Rosado's stop was his alleged violation of section 33. But, for reasons explained in the Court's ruling, he did not violate the law. The State relies on the United States Supreme Court's holding in Heien, which it asks the Court to adopt. In Heien, the Supreme Court held that a police officer's mistake of law can give rise to the reasonable suspicion needed to justify a traffic stop under the Fourth Amendment. 574 U.S. at 57. The Court reviews Heien in detail. (pp. 33-39)

9. The United States Supreme Court is the final arbiter of the Federal Constitution. Here, the Court considers whether the reasonable mistake of law doctrine comports with the State Constitution. In our federalist system, state constitutions can be a source of more expansive individual liberties than what the Federal Constitution confers. On a number of occasions, the Court has found that the New Jersey Constitution affords greater protection against unreasonable searches and seizures than the Fourth Amendment does. In State v. Novembrino, for example, the Court declined to adopt the good faith exception to the exclusionary rule established under federal law in United States v. Leon, 468 U.S. 897 (1984). See 105 N.J. 95, 157-58 (1987). (pp. 39-43)

10. The State Constitution favors the protection of individual rights and is designed to vindicate them. The key issue under New Jersey's Constitution is not whether an officer reasonably erred about the meaning of a law. It is whether a person's rights have been violated. If a law does not establish an offense, the reasonable nature of an officer's mistake cannot transform an officer's error into reasonable suspicion that a crime has been committed. If officers could search and seize a person under those circumstances, reasonable, good faith errors would erode individual rights that the State Constitution guarantees. Although officers may need to make difficult judgment calls when enforcing laws that are not entirely clear, they suffer no penalty if they make a reasonable mistake. That cannot be said of individuals who are stopped or searched based on a mistaken interpretation of the law. They cannot tailor their behavior in advance to abide by what an officer might reasonably, but mistakenly, believe the law says. And if they are then stopped -- without notice -- for conduct that no law proscribes, they suffer real harm. The Court declines to adopt a reasonable mistake of law exception under the New Jersey Constitution. The seizure of the handgun in Roman-Rosado's case -- following an unjustified car stop -- must be suppressed under the exclusionary rule. (pp. 43-46)

**AFFIRMED AS MODIFIED in both cases.**

**JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in CHIEF JUSTICE RABNER's opinion.**

SUPREME COURT OF NEW JERSEY
A-66 September Term 2019
A-67 September Term 2019
083221 and 084074

State of New Jersey,

Plaintiff-Respondent,

v.

Darius J. Carter, a/k/a
Buddah Buddah, and
Buddha J. Carter,

Defendant-Appellant.

State of New Jersey,

Plaintiff-Appellant,

v.

Miguel A. Roman-Rosado, a/k/a
Miguel Roman, Damian Rosado,
Miguel A. Roman, and
Miguel A. Rosado,

Defendant-Respondent.

State v. Darius J. Carter (A-66-19):  On certification
to the Superior Court, Appellate Division.

State v. Miguel A. Roman-Rosado (A-67-19):  On
certification to the Superior Court, Appellate
Division, whose opinion is reported at
462 N.J. Super. 183 (App. Div. 2020).

1

| Argued | Decided |
|---|---|
| April 27, 2021 | August 2, 2021 |

Regina M. Oberholzer, Deputy Attorney General, argued the cause for appellant in State v. Miguel A. Roman-Rosado (A-67-19) and argued the cause for respondent in State v. Darius J. Carter (A-66-19) (Andrew J. Bruck, Acting Attorney General, attorney; Regina M. Oberholzer, of counsel and on the briefs, and Nicole Handy, Assistant Burlington County Prosecutor, on the briefs).

Alison Perrone, First Assistant Deputy Public Defender, argued the cause for respondent in State v. Miguel A. Roman-Rosado (A-67-19) (Joseph E. Krakora, Public Defender, attorney; Emma R. Moore, Assistant Deputy Public Defender, of counsel and on the briefs).

Joseph J. Russo, Deputy Public Defender, argued the cause for appellant in State v. Darius J. Carter (A-66-19) (Joseph E. Krakora, Public Defender, attorney; Joseph J. Russo and Emma R. Moore, Assistant Deputy Public Defender, of counsel and on the briefs, and Amira R. Scurato, Designated Counsel, on the briefs).

Karen Thompson argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey Foundation, attorneys; Karen Thompson, Alexander Shalom, and Jeanne LoCicero, on the briefs).

CJ Griffin argued the cause for amicus curiae Latino Leadership Alliance of New Jersey (Pashman Stein Walder Hayden, attorneys; CJ Griffin, of counsel and on the briefs).

CHIEF JUSTICE RABNER delivered the opinion of the Court.

2

Walk through any crowded parking lot and look carefully at the license plates. Many if not most of them have frames that cover up part of the markings on the plate. Car dealers throughout the State supply many of those frames to advertise their dealerships. A variety of other organizations do likewise.

In some instances, an entire phrase, like "Garden State," is covered by the frame. In other cases, only a very small part of "New Jersey" or "Garden State" is covered, and the words are entirely legible.

According to the State, those examples all have one thing in common: the cars' drivers have violated the law, and the police have the right to stop motorists and ticket them because part of the markings on their license plates are covered. Defendants argue that interpreting the law in that way presents multiple constitutional issues.

The relevant statute, N.J.S.A. 39:3-33, reads in part as follows: "No person shall drive a motor vehicle which has a license plate frame or identification marker holder that conceals or otherwise obscures any part of any marking imprinted upon the vehicle's registration plate . . . ." In recent years, more than 100,000 drivers annually have been ticketed for violating the statute, which also has other provisions. It is unclear how many more drivers

3

are stopped by the police pursuant to the statute, and charged with other offenses or let go without a ticket.

Police officers have unfettered discretion in deciding how to enforce the statute. The Attorney General was unaware of any guidance that directs an officer's exercise of discretion.

In the twin cases before the Court in these consolidated appeals, officers engaged in pretextual stops. They stopped each defendant because part of the license plate was covered; as the arresting officer in Roman-Rosado candidly conceded, though, the purpose of the stop was to try to develop a criminal investigation. The police found contraband in both cases -- drugs in one matter and a gun in the other -- which formed the grounds for defendants' convictions.

Defendants argue that, if read expansively, the relevant statute is unconstitutionally vague and overly broad, and also invites discriminatory enforcement. To avoid those serious concerns, we interpret the law narrowly. See State v. Pomianek, 221 N.J. 66, 90-91 (2015) (discussing the doctrine of constitutional avoidance). We hold that N.J.S.A. 39:3-33 requires that all markings on a license plate be legible or identifiable. If a frame conceals or obscures a marking in a way that it cannot reasonably be identified or discerned, the driver would be in violation of the law. In practice, if a

4

registration letter or number is not legible, the statute would apply; but if a phrase like "Garden State" is partly covered but still recognizable, there would be no violation.

Under that standard, defendant Darius Carter's license plate frame, which covered the phrase "Garden State" entirely, violated the law, so the stop was lawful. In contrast, defendant Miguel Roman-Rosado's plate frame did not cover "Garden State." It partially covered only ten or fifteen percent of the slogan, which was still fully legible, so the stop was unlawful.

In Roman-Rosado's case, the State argues in the alternative that the officer made a reasonable mistake of law in interpreting section 33. Relying on the Supreme Court's ruling in Heien v. North Carolina, 574 U.S. 54 (2014), the State submits that the stop and resulting conviction, based on a reasonable but mistaken interpretation of the law, should be upheld.

We decline to adopt the standard set forth in Heien under the New Jersey Constitution. The State Constitution is designed to protect individual rights, and it provides greater protection against unreasonable searches and seizures than the Fourth Amendment. Under Article I, Paragraph 7 of the State Constitution, it is simply not reasonable to restrict someone's liberty for behavior that no actual law condemns, even when an officer mistakenly, although reasonably, misinterprets the meaning of a statute. Because there

5

was no lawful basis to stop Roman-Rosado, evidence seized as a direct result of the stop must be suppressed.

For reasons set forth more fully below, we modify and affirm the judgment of the Appellate Division in both cases.

## I.

To recount the facts, we rely on the record of the suppression hearings.

## A.

On September 28, 2014, one or more officers from the Pemberton Township Police Department stopped Darius Carter while he was driving. (It is unclear from the record how many officers were involved in the stop.) The words "Garden State" were covered on the car's license plate, and the basis for the stop was a suspected violation of N.J.S.A. 39:3-33.

Carter was driving without a license, and the police learned that he had two outstanding arrest warrants. The police arrested Carter and later found about one-half ounce of heroin and a small amount of cocaine on him.

A Burlington County grand jury indicted Carter and charged him with fourth-degree tampering with evidence, N.J.S.A. 2C:28-6(1), and four drug-related offenses.

Carter moved to suppress the drugs seized. Because the parties essentially agreed on the relevant facts, no testimony was presented at the

6

suppression hearing. The parties did not dispute that a license plate frame covered the words "Garden State" on the plate, and neither party argued that any other part of the plate was covered.

The trial court denied the motion to suppress. After reviewing an exhibit that depicted the license plate, the court found that the words "Garden State" were covered, but the rest of the plate was visible. The trial judge concluded the stop was pretextual but was "[n]onetheless . . . supported by the statute." The court found the law unambiguously barred concealing any markings on a license plate, not just the plate's registration numbers.

In connection with the above stop, Carter pled guilty on February 15, 2017 to second-degree possession of a controlled dangerous substance with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and (b)(2), one of the counts in the indictment. To resolve an unrelated indictment, he also pled to third-degree possession of a controlled dangerous substance with intent to distribute, N.J.S.A. 2C:35-5(a)(1) and (b)(3). He was sentenced to an aggregate term of ten years' imprisonment with a five-year period of parole ineligibility.

Carter appealed, and the Appellate Division affirmed his conviction and sentence. The court rejected Carter's argument that N.J.S.A. 39:3-33 is only violated "when the letters and numbers composing the vehicle's registration are obstructed." The court instead found that the statute's plain language

7

"expressly prohibits even the partial concealment of any marking on the license plate," including the words "Garden State."

B.

On April 17, 2016, a police officer from the Deptford Township Police Department stopped the car Miguel Roman-Rosado was driving. The officer testified he "was on a proactive detail" -- "stop[ping] a lot of cars for motor vehicle infractions and . . . then try[ing to] develop criminal investigations from that."

While driving right behind Roman-Rosado, the officer noticed a license plate bracket around the rear license plate that partially covered the words "Garden State." According to the officer, the frame covered about ten or fifteen percent of the bottom of the letters. Nonetheless, the officer said he could clearly recognize the words "Garden State." The testimony at the hearing focused only on those words. A redacted photo of the license plate and frame appear at Appendix A.

The officer stopped the car based on a suspected violation of N.J.S.A. 39:3-33. The car's registered owner was in the front passenger seat, and her child was in the right rear seat. When asked for his credentials, Roman-Rosado provided a state identification card but did not have a driver's license. The officer called dispatch and learned that Roman-Rosado had two

8

outstanding arrest warrants. The officer then called for backup to arrest Roman-Rosado.

Next, the officer asked Roman-Rosado to step out of the car. As he complied, the officer spotted "a white garment that looked like it had something bulky wrapped in it, shoved partially under the seat where [Roman-Rosado] was seated." Concerned for his safety, the officer reached into the car, removed the object, unwrapped it, and found an unloaded handgun. The officer then handcuffed Roman-Rosado and asked both passengers to step out of the car. A search of the rest of the car, based on the smell of burnt marijuana, turned up no other contraband.

A Gloucester County grand jury indicted Roman-Rosado and charged him with second-degree unlawful possession of a handgun without a permit, N.J.S.A. 2C:39-5(b). Roman-Rosado moved to suppress the handgun as the fruit of an unlawful stop.

At the end of the suppression hearing, at which the officer testified, the trial court denied defendant's motion. The court acknowledged there were "minimal, de minimis obstructions" on the plate -- a portion of the bottom of "Garden State" as well as "the top [of] the 'N' . . . [and] the 'J'" in New Jersey. "Without question," the judge found, the plate was "a readable license plate" that law enforcement "could very easily . . . run . . . to determine the

9

[car's] registration." Nonetheless, the court observed the statute barred the "obstruction of any marking on the" plate and did not allow for any "subjective interpretation by the officer." The trial court therefore concluded the stop was justified.

The court also upheld the seizure of the handgun. The trial judge credited the officer's testimony and noted that, with two people in the car, the "officer's safety . . . warrant[ed] securing that item."

On October 30, 2017, Roman-Rosado pled guilty to second-degree possession of a weapon by a person not permitted to do so, N.J.S.A. 2C:39-7(b)(1). The trial court sentenced him to five years' imprisonment with a mandatory five-year period of parole ineligibility.

The Appellate Division reversed defendant's conviction. State v. Roman-Rosado, 462 N.J. Super. 183, 190 (App. Div. 2020). The appellate court first analyzed the text of N.J.S.A. 39:3-33 -- specifically, its command that no license plate frame or holder conceal or obscure any markings on the plate. Based on the common meaning of those terms, the court concluded the statute is unambiguous and "prohibits the concealment and obfuscation of identifying information on license plates." Id. at 198. The Appellate Division added, "[w]e do not read the statute to establish a motor vehicle violation for

cosmetic license plate frames that make minimal contact with lettering on the license plate and do not make the plate any less legible." Ibid.

"By 'less legible,'" the court explained, "we mean an inability to discern critical identifying information imprinted on the license plate." Id. at 199. Otherwise, officers could stop cars with only "the slightest, and candidly insignificant, covering of 'Garden State' on a driver's rear license plate" -- an outcome the court considered absurd. Ibid.

In addition to the common understanding of the words in the statute, the court found support for its ruling from State in Interest of D.K., 360 N.J. Super. 49 (App. Div. 2003). Because the Appellate Division concluded that "[o]nly a license plate marking that is concealed or obscured, meaning it cannot readily be deciphered, constitutes a violation," the court found there was no reasonable basis for the police to stop Roman-Rosado's car. Id. at 199-200. As a result, the court held that the subsequent search of the car was unconstitutional, and the handgun should have been suppressed. Id. at 200. The Appellate Division therefore remanded the matter to allow Roman-Rosado the "opportunity to withdraw his guilty plea." Ibid.

Although the court recognized it was not necessary to address any additional arguments about whether the search was lawful, ibid., the Appellate

11

Division considered and rejected the claim that the search could be justified as a protective sweep, id. at 203-07.

C.

We granted defendants' petitions for certification. 241 N.J. 498 (2020); 241 N.J. 501 (2020). We also granted the American Civil Liberties Union of New Jersey (ACLU) and the Latino Leadership Alliance of New Jersey (LLA) leave to appear as amici curiae in both cases.

II.

Because the parties' arguments are substantially similar in both appeals, we summarize them together to the extent possible.

The Attorney General, on behalf of the State, argues that the police had reasonable suspicion to stop both defendants. The Attorney General relies on the plain language of N.J.S.A. 39:3-33 and submits the statute is violated whenever a frame or holder covers any part of any marking on a license plate, even if the plate is still readable. The Attorney General also contends the law applies to the words "Garden State" and not just the registration number on a plate.

In response to defendants' arguments, the Attorney General maintains the statute is constitutional. The Attorney General argues the law is neither overly broad, because it does not intrude upon any constitutionally protected

12

conduct, nor unconstitutionally vague, because the statute provides clear notice of the conduct it prohibits. The Attorney General also submits the law does not violate defendants' freedom of speech by prohibiting motorists from covering the state's motto, "Garden State."

The Attorney General argues in the alternative that the stops were lawful, even if the Court finds the officers' interpretation of the statute was incorrect, because they stemmed from objectively reasonable mistakes of law by the officers. In that regard, the Attorney General urges this Court to adopt the United States Supreme Court's holding in Heien.

In addition, the State maintains the seizure of the handgun in Roman-Rosado's case was part of a lawful protective sweep.

Defendants argue that the stops in both appeals were unlawful. They argue that N.J.S.A. 39:3-33, when read in its proper context, does not prohibit covering cosmetic slogans at the bottom of a license plate. According to defendants, the statute is designed to ensure that registration numbers are always visible, not images or slogans.

Such an interpretation, defendants contend, "rescues the statute from unconstitutionality." They argue the State's interpretation of the law renders it vague and overly broad, and invites arbitrary and capricious enforcement. They also contend that requiring drivers to display the phrase "Garden State"

13

violates their free speech rights under <u>Wooley v. Maynard</u>, 430 U.S. 705 (1977).

Defendants maintain that because a police officer's mistake of law cannot erase a violation of a person's constitutional rights, this Court should not adopt the reasonable mistake of law doctrine outlined in <u>Heien</u>.

Finally, Roman-Rosado contends that, after he was removed from the car, the police search of the vehicle was unconstitutional. As a result, defendant argues, the handgun should be suppressed.

The ACLU and LLA support defendants' arguments. They maintain that N.J.S.A. 39:3-33 is designed to help the police identify vehicles, an aim that is not furthered when officers stop drivers for license plate frames that cover slogans like "Garden State." The LLA also submits that the requirement to display "Garden State" on license plates was enacted to promote New Jersey's agricultural industry, not to advance public safety.

In addition, amici assert that, under the State's interpretation, N.J.S.A. 39:3-33 is unconstitutionally vague and overbroad, and opens the door to pretextual stops that disproportionately affect people of color. The Public Defender, on behalf of defendants, stresses the latter point as well.

Finally, amici ask the Court to reject <u>Heien</u> because the State Constitution provides greater protection than the Fourth Amendment.

14

III.

A.

We begin with the statutory scheme. The applicable law states that

> [n]o person shall drive a motor vehicle which has a license plate frame or identification marker holder that conceals or otherwise obscures any part of any marking imprinted upon the vehicle's registration plate or any part of any insert which the director, as hereinafter provided, issues to be inserted in and attached to that registration plate or marker.
>
> [N.J.S.A. 39:3-33, ¶ 3 (section 33).]

For a first offense, a driver can be fined up to $100 and, "[i]n default of the payment thereof," shall be imprisoned up to ten days in county jail. Id. ¶ 7. Both penalties are doubled for a second violation. Ibid.[1]

A related provision in Title 39 requires that the words "Garden State" "be imprinted" on license plates for passenger cars. N.J.S.A. 39:3-33.2 (instructing the Director of the Division of Motor Vehicles -- now the Motor Vehicle Commission (MVC), see N.J.S.A. 39:2A-2(y) -- to implement the

---

[1] Other sections of the law are not relevant to this appeal. They address the number and placement of license plates, N.J.S.A. 39:3-33, ¶ 1; require that plates "be kept clear and distinct and free from grease, dust or other blurring matter," id. ¶ 2; empower the Director to issue license plate inserts, id. ¶ 4; and prohibit the display of fictitious registration numbers or plates that resemble license plates "for the purpose of advertisement," id. ¶ 5. As noted above, references to "section 33" in this opinion relate to the statute's third paragraph.

requirement).  Yet other statutes authorize the Director to issue specialty plates, which do not contain the phrase.  See, e.g., N.J.S.A. 39:3-27.67 (Battleship U.S.S. New Jersey license plates); N.J.S.A. 39:3-27.85 (Pinelands Preservation license plates); N.J.S.A. 39:3-27.90 (Conquer Cancer license plates); N.J.S.A. 39:3-27.92 (Liberty State Park license plates); N.J.S.A. 39:3-27.123 (Law Enforcement Officer Memorial license plates); N.J.S.A. 39:3-27.127 (Be An Organ Donor license plates); N.J.S.A. 39:3-33.10 (Wildlife Conservation license plates).

In all, the MVC website lists scores of alternative designs to the standard "Garden State" plate.  They include 17 "dedicated" plates (e.g., "Deborah Heart & Lung Center" and "Shore to Please"); 20 service organizations (e.g., the "American Legion" and "Disabled Vets"); 18 community organizations (e.g., "Kiwanis International" and "Rotarian"); 10 alumni organizations (e.g., "Rutgers" and "Seton Hall"); 13 military groups (e.g., "Army Reserve" and "Gold Star Family"); 4 volunteer workers (e.g., "First Aider" and "EMT"); 10 sports teams (e.g., "Mets" and "Phillies"); 11 NASCAR plates (e.g., "Dale Earnhardt, Sr." and "NASCAR Fan"); 6 professions (e.g., "Chiropractor" and "Physician"); and 2 special vehicle plates (for historic and antique cars).  See N.J. Motor Vehicle Comm'n, Personalized Plates, https://www.state.nj.us/ mvc/vehicles/personalized.htm (last visited July 30, 2021) (with sublinks for

16

dedicated, specialty, sports, and special vehicle plates, military personnel, volunteer workers, and professionals).  For the alternative designs, a specialty slogan replaces the words "Garden State."

A companion statute to section 33 addresses dealerships, booster organizations, and other groups that supply license plate frames or holders:

> A person shall not sell, offer for sale, distribute, transfer, purchase, receive, or possess any merchandise, including but not limited to retractable license plate holders, reflective spray, or anti-photograph license plate covers, knowing that such merchandise is designed or intended to be used to conceal or degrade the legibility of any part of any marking imprinted upon a vehicle's license plate for the purpose of evading law enforcement.  The penalty for a violation of this section shall be a fine not to exceed $500. . . .
>
> [N.J.S.A. 39:3-33c (section 33c).]

According to the Administrative Office of the Courts, the police issue more than 100,000 violation notices for section 33 in a year.  In 2018, 117,265 summonses were issued; in 2019, 120,515 were issued.  The data applies to the entire statute.  Not a single violation notice was issued for section 33c from 2012 to 2019.

## B.

To interpret section 33, we look to settled principles of statutory construction.

17

The overriding goal of statutory interpretation is to determine and give meaning to the Legislature's intent. State v. J.V., 242 N.J. 432, 442 (2020). We start with the language of the statute and give words their "generally accepted meaning." N.J.S.A. 1:1-1. We also read and construe words and phrases in their context. Ibid. Rather than review them in isolation, we consider the words of a statute "in context with related provisions so as to give sense to the legislation as a whole." DiProspero v. Penn, 183 N.J. 477, 492 (2005).

If the text of a law is clear, the "court's task is complete." State v. Lopez-Carrera, 245 N.J. 596, 613 (2021). If the language is ambiguous, courts may look to extrinsic sources, "including legislative history, committee reports, and other sources, to discern the Legislature's intent." Ibid. Courts also consider extrinsic aids "if a literal reading of the statute would yield an absurd result, particularly one at odds with the overall statutory scheme." Rozenblit v. Lyles, 245 N.J. 105, 122 (2021) (quoting Wilson by Manzano v. City of Jersey City, 209 N.J. 558, 572 (2012)).

If a statute "is susceptible to two reasonable interpretations, one constitutional and one not," the Court "assume[s] that the Legislature would want us to construe the statute in a way that conforms to the Constitution."

18

Pomianek, 221 N.J. at 90-91 (citing State v. Johnson, 166 N.J. 523, 534, 540-41 (2001)).

C.

The State contends that the statute's words are clear: a license plate frame cannot cover any part of any marking on a license plate. Defendants stress that section 33 bars the use of license plate frames or holders only insofar as they "conceal[] or otherwise obscure[]" certain markings, quoting N.J.S.A. 39:3-33, ¶ 3 (emphases added). Both sides present strong arguments.

To begin with, we note that the term "marking" in section 33 extends to any impressions on a license plate. We do not find support in the statutory scheme or the language of section 33 for the notion that "marking" refers only to a plate's registration numbers and letters.

Throughout the Motor Vehicle Code, the Legislature uses the term "marking" broadly. N.J.S.A. 39:3-27.67, for example, requires Battleship U.S.S. New Jersey specialty plates to display the image of a battleship "[i]n addition to the registration number and other markings of identification otherwise prescribed by law." (emphasis added). N.J.S.A. 39:3-33.10 uses similar language for Wildlife Conservation specialty plates, which must depict language or an emblem in support of wildlife conservation "in addition to the registration number and other markings or identification otherwise prescribed

19

by law." (emphasis added); accord N.J.S.A. 39:3-27.13 (New Jersey National Guard license plates); N.J.S.A. 39:3-27.79 (Shade Tree and Community Forest Preservation license plates); N.J.S.A. 39:3-27.116 (Promote Agriculture license plates); N.J.S.A. 39:3-27.141 (Gold Star Family license plates); see also N.J.S.A. 39:3-33.2 (instructing the MVC Director to imprint the words "Garden State" "in addition to other markings"). Under the Code, then, "marking" includes more than registration numbers.

We turn next to the language of section 33 and its key terms -- "conceal" and "obscure." As commonly used, "conceal" means "to prevent disclosure or recognition of," or "to place out of sight." Webster's Third New International Dictionary (Unabridged) 469 (1981); see also Black's Law Dictionary 360 (11th ed. 2019) (defining "concealment" as "[t]he act of preventing disclosure or refraining from disclosing," or "[t]he act of removing from sight or notice; hiding"); Ballentine's Law Dictionary 237 (3d ed. 1969) (defining "conceal" as "[t]o keep facts secret or withhold them from the knowledge of another; to hide or secrete physical objects from sight or observation").

To "obscure" typically means "to make dim," "to conceal or hide from view as by or as if by covering wholly or in part: make difficult to discern," or "to make unintelligible or vague." Webster's Third New International Dictionary at 1557. As an adjective, "obscure" is defined as "dark, dim," "not

20

readily perceived," "not readily understood:  lacking clarity or legibility," and "lacking clarity or distinctness."  Ibid.

In Roman-Rosado, the Appellate Division concluded the statute does not address "frames that make minimal contact with lettering on the license plate and do not make the plate any less legible."  462 N.J. Super. at 198.  We agree.  Countless license plate frames cover a small fraction of the top of "New Jersey," or the bottom of "Garden State," but the words can still be easily identified.  That is not true if a frame instead covers a single letter or number of the registration marks in the center of a license plate.  The operative words in the statute -- "conceal" and "obscure" -- when given their ordinary meaning, distinguish between those examples.  See N.J.S.A. 39:3-33 ¶ 3.  We understand the terms to focus on legibility, not on every minor covering of otherwise recognizable markings.

Reading the statute in that way also avoids absurd results.  Drive on any highway in the state to see that a large number of license plate frames cover the very top of the letters "N" and "J" in "New Jersey" or the bottom of the letters in "Garden State."  Under the State's interpretation of section 33, countless drivers could all be stopped by the police and be exposed to a fine or possible jail sentence.  That reading of the law is at odds with the view that the Legislature "writes motor-vehicle laws in language that can be easily grasped

21

by the public so that every motorist can obey the rules of the road." State v. Scriven, 226 N.J. 20, 34 (2016).

That said, we recognize the force of the State's argument. We note, as well, that section 33 does not expressly include language about legibility. By contrast, section 33c, addressed to dealers and other suppliers, refers to frames "designed or intended to be used to conceal <u>or degrade the legibility</u> of any part of any marking imprinted upon a vehicle's license plate." N.J.S.A. 39:3-33c (emphasis added).

We therefore consider the statute's legislative history and defendants' constitutional claims as part of our analysis.

## D.

The legislative history is not expansive and sheds little light on the scope of section 33. The third paragraph was introduced in 1989. See L. 1989, c. 132. The Sponsor's Statement accompanying an early version of the Assembly bill explained that a license plate frame or holder could not "conceal[] or obscure[] <u>any of the information</u> on the plate." Sponsor's Statement to A. 1245 (L. 1989, c. 132) (emphasis added). Neither the

statement nor any other documents relating to the law's passage expand on the meaning of its key terms.[2]

Amendments to other paragraphs of N.J.S.A. 39:3-33 reflect the Legislature's concern about the legibility of license plates. A series of amendments in 1968, 1981, and 1989 relate to the use of reflectorized license plates. See L. 1968, c. 363; L. 1981, c. 133; L. 1989, c. 202. In 1968, the Legislature required that license plates be treated with "reflectorized materials" "to increase the visibility and legibility thereof." L. 1968, c. 363. The law was repealed in 1973, see L. 1973, c. 164, and reenacted in 1981, see L. 1981, c. 133. In 1989, the Legislature mandated that fully reflectorized license plates bearing a new color scheme and style be reissued. See L. 1989, c. 202. The Sponsor's Statement explained that the new license plates "will be fully reflectorized for increased visibility and legibility." Sponsor's Statement to S. 835 (L. 1989, c. 202) (emphasis added). Senator Frank Graves, the bill's sponsor, reportedly explained that reflectorized plates would "save lives and help crime-fighting efforts" by allowing the police to "read license numbers

---

[2] The parties cite State v. Donis, in which this Court observed that "[t]he very purpose of [N.J.S.A. 39:3-33] is to identify the owner of a car should the need arise from his or her license plate." 157 N.J. 44, 55 (1998). For context, the comment followed a sentence about the "required . . . display of a license plate on both the front and rear of all cars registered in New Jersey." Ibid. (citing N.J.S.A. 39:3-33). The Court did not review the legislative history of section 33 in Donis.

23

more easily." Senate OKs Bills on License Plates, Dogs, Courier-Post, Nov. 21, 1989.[3]

# IV.

## A.

Defendants argue that a broad reading of section 33 does not pass constitutional muster. They advance several theories.

According to defendants, a law that criminalizes de minimis obstructions of phrases like "Garden State" serves no legitimate state interest and fails under the permissive rational basis test. "[A] statute that bears no rational relationship to a legitimate government goal and that arbitrarily deprives a person of a liberty interest or the right to pursue happiness is unconstitutional." State in Interest of C.K., 233 N.J. 44, 73 (2018).

---

[3] Amicus LLA highlights the legislative history of an accompanying statute -- N.J.S.A. 39:3-33.2 -- which requires that "Garden State" be printed on New Jersey license plates. According to the LLA, the history reveals the motto was introduced to promote the state's agricultural industry, not to enhance public safety. See Governor's Veto Message to Comm. Substitute for A. 250 (Aug. 17, 1953) (noting "the laudable purpose" of the bill was to "advertis[e] the natural advantages of our great State"). The LLA emphasizes that two governors vetoed the proposal before it eventually became law in 1954, out of a concern that the addition of "Garden State" would distract from the important function of license plates and reduce the space available for registration information. See ibid.; Governor's Veto Message for A. 454 (Aug. 2, 1954). The Legislature overrode the second veto. L. 1954, c. 221. That history, however, does not help resolve the issue raised in these appeals.

Defendants and amici contend as well that the statute, as interpreted by the State, is both unconstitutionally vague and overly broad. The two claims differ analytically:

> The vagueness concept . . . rests on principles of procedural due process; it demands that a law be sufficiently clear and precise so that people are given fair notice and adequate warning of the law's reach. The overbreadth concept, on the other hand, rests on principles of substantive due process; the question is not whether the law's meaning is sufficiently clear, but whether the reach of the law extends too far. The evil of an overbroad law is that in proscribing constitutionally protected activity, it may reach farther than is permitted or necessary to fulfill the state's interests.
>
> [Town Tobacconist v. Kimmelman, 94 N.J. 85, 125 n.21 (1983).]

Vague laws leave people guessing about their meaning. State v. Morrison, 227 N.J. 295, 314 (2016). As the Court explained in State v. Lee,

> [a] penal statute should not become a trap for a person of ordinary intelligence acting in good faith, but rather should give fair notice of conduct that is forbidden. A defendant should not be obliged to guess whether his conduct is criminal. Nor should the statute provide so little guidance to the police that law enforcement is so uncertain as to become arbitrary.
>
> [96 N.J. 156, 166 (1984) (citations omitted).]

Overly broad statutes suffer from a different flaw. They invite "excessive governmental intrusion into protected areas" by "extend[ing] too

25

far." Karins v. Atlantic City, 152 N.J. 532, 544 (1998) (quoting Petition of Soto, 236 N.J. Super. 303, 324 (App. Div. 1989)); see also Papachristou v. City of Jacksonville, 405 U.S. 156, 165 (1972) (noting that for the broad vagrancy law in question, "the net cast is large, not to give the courts the power to pick and choose but to increase the arsenal of the police").

If a "statute 'reaches a substantial amount of constitutionally protected conduct,'" it can be invalidated. State v. Burkert, 231 N.J. 257, 276 (2017) (quoting State v. Mortimer, 135 N.J. 517, 530 (1994)). Rather than strike down a law on that ground, however, if the "statute is 'reasonably susceptible' to an interpretation that will render it constitutional," courts construe the law narrowly to remove any doubts about its constitutional validity. Id. at 277 (quoting State v. Profaci, 56 N.J. 346, 350 (1970)).

We agree that section 33, if read broadly, raises serious constitutional concerns. Roman-Rosado was stopped for driving a car with a license plate frame that covered ten to fifteen percent of the bottom of the phrase "Garden State." But the words, like the rest of the markings on the plate, were fully recognizable. Most people would have no idea that section 33 might apply in such a situation because the law does not give clear and precise notice that it reaches that far. See Town Tobacconist, 94 N.J. at 125 n.21.

26

License plate frames abound, and they invariably cover some part of the markings on the plates they surround. Frames supplied by dealerships, booster organizations, non-profit groups, and others often cover the bottom of "Garden State" or the very top of "New Jersey." Simply driving a car off the dealer's lot with that type of license plate frame would amount to a violation and give officers a basis to stop the car. And if the proposed broad reading of section 33 were the standard, tens if not hundreds of thousands of New Jersey drivers would be in violation of the law.

The State asserts section 33 serves a rational purpose and addresses a real concern: by outlawing frames that conceal or obscure any markings on a license plate, the statute enables civilians and police officers to recognize license plates at a glance. The State also contends that markings like "Garden State" need to be fully visible because license plates can be more difficult to identify from certain angles.

Despite those concerns, a broad reading of section 33 opens the door wide. Indeed, which of the hundreds of thousands of cars on the road should officers pull over under the broad reading of the law the State advances? The Attorney General could point to no guidance that directs police officers how to enforce the statute. And limitless discretion can invite pretextual stops, like

27

the stops in both cases here. It can also lead to arbitrary and discriminatory enforcement.

It is cause for concern, as well, that despite the State's frequent use of section 33 to stop drivers, no summonses were issued under N.J.S.A. 39:3-33c from 2012 through 2019. As noted above, that statute bars the sale or transfer of license plate holders "designed or intended to be used to conceal or degrade the legibility of any part of any marking imprinted upon a vehicle's license plate for the purpose of evading law enforcement." N.J.S.A. 39:3-33c.

N.J.S.A. 39:3-33c includes two elements missing from section 33 -- a focus on legibility and a purpose to evade law enforcement -- which might account for the law's limited use. But the State can take other steps to compel car dealerships and other organizations to stop distributing and selling license plate frames that the State believes violate section 33. It has not done so.

Law enforcement commonly attacks problems at their source. In the area of drug enforcement, for example, successful enforcement strategies target kingpins and suppliers to stem the flow of drugs, not just low-level users. Yet here, rather than take any action against the source of the offending frames, motorists by the thousands are pulled over each year.

To the extent section 33 has two meanings -- a narrow one that focuses on whether a license plate is legible, and a broader one that raises serious

28

constitutional issues -- the doctrine of constitutional avoidance calls for a narrow interpretation.  Pomianek, 221 N.J. at 90-91.  Because "we assume that the Legislature would want us to construe the statute in a way that conforms to the Constitution," we adopt the narrower reading.  Id. at 91.

We therefore hold that section 33 requires that all markings on a license plate be legible or identifiable.  That interpretation is consistent with the plain meaning of the statute's wording.  If a license plate frame or holder conceals or obscures a marking such that a person cannot reasonably identify or discern the imprinted information, the driver would be in violation of the law.  See Roman-Rosado, 462 N.J. Super. at 199; see also D.K., 360 N.J. Super. at 53 (noting in dicta that the term "obscure" in section 33 means to make a license plate "less legible").

In other words, a frame cannot cover any of the plate's features to the point that a person cannot reasonably identify a marking.  So, for example, if even a part of a single registration letter or number on a license plate is covered and not legible, the statute would apply because each of those characters is a separate marking.  If "Garden State," "New Jersey," or some other phrase is covered to the point that the phrase cannot be identified, the law would likewise apply.  But if those phrases were partly covered yet still recognizable, there would be no violation.

29

When applying the above test, trial courts will be asked to evaluate whether license plate markings are legible or identifiable from the perspective of an objectively reasonable person. Cf. State v. Stovall, 170 N.J. 346, 356-57 (2002) (noting that reasonable suspicion to justify an investigatory stop is viewed from the standpoint of an objectively reasonable officer). That judgment can be based on still photos or videos, like the evidence presented in these appeals.

B.

Applying the above test here, Roman-Rosado did not violate the statute. The officer who stopped Roman-Rosado testified that only ten or fifteen percent of the words "Garden State" were obstructed, and he conceded he could clearly identify the phrase on the license plate. The trial judge found the plate was "without question" "a readable license plate." See Appendix A. Because "Garden State" was not "conceal[ed] or otherwise obscur[ed]" within the meaning of section 33, and all features of the plate were legible, the Appellate Division properly concluded the stop was unlawful.

In Carter's case, however, it is undisputed that "Garden State" was entirely covered. As a result, the plate violated the statute, and law enforcement officers had the right to stop Carter. See Scriven, 226 N.J. at 33-

30

34 (noting that an officer's reasonable and articulable suspicion that a driver of a car is committing a motor-vehicle violation justifies a stop).

We do not find persuasive Carter's argument that the statute violated his rights under the First Amendment by requiring him to display the state motto, "Garden State." Carter relies on the United States Supreme Court's decision in Wooley. In that case, the Court succinctly stated the issue before it: "whether the State of New Hampshire may constitutionally enforce criminal sanctions against persons who cover the motto 'Live Free or Die' on passenger vehicle license plates because that motto is repugnant to their moral and religious beliefs." Wooley, 430 U.S. at 706-07 (emphasis added).

George and Maxine Maynard had filed an action in federal court to enjoin the state's enforcement of laws that (1) required license plates for noncommercial cars to be embossed with the state motto, and (2) made it a misdemeanor to obscure any letters on a license plate, which included the motto. Id. at 707, 709 (citing N.H. Rev. Stat. Ann. §§ 263:1, 262:27-c). George Maynard had been charged with a violation for covering up the motto on three occasions in five weeks. Id. at 708.

The Maynards were "followers of the Jehovah's Witnesses faith," id. at 707, and George Maynard filed an affidavit with the district court that stated, "I refuse to be coerced by the State into advertising a slogan which I find

31

morally, ethically, religiously and politically abhorrent." Id. at 709, 713. The

Supreme Court affirmed the district court and ruled in favor of the Maynards.

The Supreme Court held,

> New Hampshire's statute in effect requires that appellees use their private property as a "mobile billboard" for the State's ideological message – or suffer a penalty, as Maynard already has. . . . The First Amendment protects the right of individuals to hold a point of view different from the majority and to refuse to foster, in the way New Hampshire commands, an idea they find morally objectionable.
>
> [Id. at 715 (emphases added).]

The Court therefore concluded that New Hampshire could not require the

Maynards "to display the state motto upon their vehicle license plates." Id. at

717.

Wooley thus involved two components: (1) compelled speech by the

government; and (2) content a party disagreed with. And in a variety of cases,

the Supreme Court has suggested that challengers should voice some objection

to the content of the speech in question. See Johanns v. Livestock Mktg.

Ass'n, 544 U.S. 550, 557 (2005) (stating that the government unlawfully

compels speech when "an individual is obliged personally to express a

message he disagrees with, imposed by the government"); Walker v. Tex. Div.,

Sons of Confederate Veterans, Inc., 576 U.S. 200, 219 (2015) (noting that the

First Amendment "limits a State's authority to compel a private party to

32

express a view with which the private party disagrees"); <u>Janus v. AFSCME, Council 31</u>, 585 U.S. ___, 138 S. Ct. 2448, 2464 (2018) (stating that the aims of free speech are undermined when "the Federal Government or a State . . . compels [individuals] to voice ideas with which they disagree"); <u>see also</u> <u>Cressman v. Thompson</u>, 798 F.3d 938, 963 (10th Cir. 2015) (stating, in a case involving symbolic speech, that "merely objecting to the fact that the government has required speech is not enough; instead, a party must allege some disagreement with the viewpoint conveyed by this speech").

Carter argues generally that section 33 violates his First Amendment rights because the law bars individuals from covering "Garden State" on a license plate. Unlike in <u>Wooley</u>, the record before this Court does not include any statement or certification that Carter disagrees with the expression "Garden State" or finds it "morally objectionable." <u>Wooley</u>, 430 U.S. at 715. We therefore decline to consider his First Amendment argument further.

V.

Because we find that Roman-Rosado did not violate the statute, we next consider the appropriate remedy in his case. That requires the Court to evaluate the reasonable mistake of law doctrine.

33

A.

The Fourth Amendment and Article I, Paragraph 7 of the State Constitution guarantee individuals the right to be free from unreasonable searches and seizures. Both provide that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7. "A motor-vehicle stop by the police" constitutes a seizure. Scriven, 226 N.J. at 33. To justify a stop, an "officer must have a reasonable and articulable suspicion that the driver . . . is committing a motor-vehicle violation" or some other offense. Id. at 33-34.

The sole basis for Roman-Rosado's stop was his alleged violation of section 33. But, for reasons that are explained above, he did not violate the law. The State argues that even if the officer's interpretation of section 33 was mistaken, his mistake was objectively reasonable and the stop was therefore lawful. The State relies on the United States Supreme Court's holding in Heien, which it asks this Court to adopt.

In Heien, the Supreme Court held that a police officer's mistake of law can give rise to the reasonable suspicion needed to justify a traffic stop under the Fourth Amendment. 574 U.S. at 57. In the case, an officer pulled over a car after noticing that its right brake light did not work. Ibid. The car's

34

owner, Nicholas Brady Heien, gave consent for the police to search the car. Id. at 58. Officers found cocaine and charged Heien with attempted trafficking of cocaine. Ibid.

Heien moved to suppress the evidence seized. He argued that the stop and search of the car violated the Fourth Amendment. Ibid. The trial court denied the motion and held that the faulty brake light gave the officer reasonable suspicion to stop the car. Ibid.

The North Carolina Court of Appeals reversed. State v. Heien, 714 S.E.2d 827, 831 (N.C. Ct. App. 2011). It held that the initial car stop was invalid because driving with one working brake light did not actually violate the applicable North Carolina statute. Ibid. Because the statute required cars to have "a stop lamp," which the law also referred to as "[t]he stop lamp," the court concluded that Heien's car needed only one working brake light. Id. at 830-31 (emphases added) (citing N.C. Gen. Stat. § 20-129(g) (2009)). Accordingly, the appellate court held that the stop was "objectively unreasonable" and violated the Fourth Amendment. Id. at 831.

The North Carolina Supreme Court reversed the appellate court. State v. Heien, 737 S.E.2d 351, 352 (N.C. 2012). The state supreme court assumed, for the purposes of the appeal, that a single faulty brake light did not violate the statute. Id. at 354. But in light of related provisions in the code, the court

35

held that the officer could have reasonably, yet mistakenly, read the statute to require two working brake lights. Id. at 358-59. Because the officer's mistaken interpretation of the law was reasonable, the North Carolina Supreme Court held the stop did not violate the Fourth Amendment. Id. at 359.

The United States Supreme Court agreed. It held that an objectively reasonable mistake of law can give rise to reasonable suspicion and sustain a stop under the Fourth Amendment. Heien, 574 U.S. at 60, 67-68. Writing for the majority, Chief Justice Roberts observed that "the ultimate touchstone of the Fourth Amendment is 'reasonableness'" and that reasonable suspicion does not demand perfection. Id. at 60 (quoting Riley v. California, 573 U.S. 373, 381 (2014)).

The Supreme Court recounted "that searches and seizures based on mistakes of fact can be reasonable." Id. at 61. The Court added that "reasonable men make mistakes of law, too, and such mistakes are no less compatible with the concept of reasonable suspicion." Ibid. As the Chief Justice explained,

> [w]hether the facts turn out to be not what was thought, or the law turns out to be not what was thought, the result is the same: The facts are outside the scope of the law. There is no reason, under the text of the Fourth Amendment or our precedents, why this same result should be acceptable when reached by way of a reasonable mistake of fact, but not when reached by way of a similarly reasonable mistake of law.

36

[Ibid.]

The majority emphasized that "[t]he Fourth Amendment tolerates only reasonable mistakes, and those mistakes -- whether of fact or of law -- must be objectively reasonable." Id. at 66. They cannot be based on "the subjective understanding of the particular officer involved." Ibid. Based on the language of the statute, the Supreme Court held that it was "objectively reasonable for [the] officer . . . to think that Heien's faulty right brake light was a violation of North Carolina law. And because the mistake of law was reasonable, there was reasonable suspicion justifying the stop." Id. at 67-68.

Justice Kagan wrote a concurring opinion. Id. at 68-71 (Kagan, J., concurring). She agreed with the majority that the traffic stop did not violate the Fourth Amendment, id. at 68, 71, but underscored "important limitations" as to when an officer's mistake of law is objectively reasonable, id. at 69. Justice Kagan outlined the following limiting standard:

> If [a] statute is genuinely ambiguous, such that overturning the officer's judgment requires hard interpretive work, then the officer has made a reasonable mistake. But if not, not. . . . [T]he statute must pose a really difficult or very hard question of statutory interpretation. And indeed, both North Carolina and the Solicitor General agreed that such cases will be exceedingly rare.
>
> [Id. at 70 (quotations omitted).]

37

Justice Sotomayor dissented.  Id. at 71-80 (Sotomayor, J., dissenting). In her view, "determining whether a search or seizure is reasonable requires evaluating an officer's understanding of the facts against the actual state of the law."  Id. at 71.  After surveying the case law, Justice Sotomayor concluded "there is nothing . . . requiring us to hold that a reasonable mistake of law can justify a seizure under the Fourth Amendment, and quite a bit suggesting just the opposite."  Id. at 76.

The reasonableness inquiry at the core of the Fourth Amendment, the dissent observed, has "been focused on officers' understanding of the facts." Id. at 72.  And "it has been justified in large part based on the recognition that officers are generally in a superior position, relative to courts, to evaluate those facts and their significance as they unfold."  Ibid.  The mistake of fact doctrine, the dissent explained, springs from the "recognition that police officers operating in the field have to make quick decisions."  Id. at 73 (citing Illinois v. Rodriguez, 497 U.S. 177, 186 (1990)).  The doctrine also stems from an "understanding that police officers have the expertise to 'dra[w] inferences and mak[e] deductions . . . that might well elude an untrained person.'"  Ibid. (alterations and omission in original) (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)).

38

By contrast, Justice Sotomayor noted, "the meaning of the law is not probabilistic in the same way that factual determinations are." Ibid. It is "definite and knowable," and it is for the courts, not officers, to interpret. Ibid. (quoting Cheek v. United States, 498 U.S. 192, 199 (1991)).

Justice Sotomayor warned that the majority's decision would "erod[e] the Fourth Amendment's protection of civil liberties," ibid., have "the perverse effect of preventing or delaying the clarification of the law," id. at 74, and cause "innocent citizen[s] . . . to shoulder the burden of being seized whenever the law may be susceptible to an interpretive question," id. at 79. For those reasons, the dissent "would . . . hold that an officer's mistake of law, no matter how reasonable, cannot support the individualized suspicion necessary to justify a seizure under the Fourth Amendment." Id. at 80.

This Court adopted the reasonable mistake of fact doctrine in State v. Sutherland. See 231 N.J. 429, 431, 437 (2018) ("[A] reasonable mistake of fact on the part of a police officer will not render a search or arrest predicated on that mistake unconstitutional." (citing State v. Handy, 206 N.J. 39, 53-54 (2011))). We have twice declined invitations to adopt the reasonable mistake of law doctrine set forth in Heien.

In both cases, we found the statutes in question were clear, and the officers' interpretations were not objectively reasonable. Id. at 444-45

(finding that a car stop for a supposed violation of statutes requiring two working rear lamps -- one on each side -- was not a reasonable mistake of law because the statutes were clear and the driver had two functioning rear lamps); Scriven, 226 N.J. at 35-36 (finding that a car stop for a supposed violation of a statute requiring drivers to dim their high beams when approaching "an oncoming vehicle" was not a reasonable mistake of law because the statute was clear and the driver was not approaching any vehicles). As a result, we had no reason to consider Heien's holding in either case.

Here, both parties have presented strong arguments about the scope of section 33. Faced with statutory language that was not entirely clear, a police officer could reasonably, but mistakenly, have thought the statute barred any covering of a marking on a license plate, even if the plate was fully legible. Under the circumstances, then, we must consider the reasonable mistake of law doctrine for the first time.

We do not question the Supreme Court's interpretation of the Fourth Amendment. The United States Supreme Court is the final arbiter of the Federal Constitution. See Comm. to Recall Robert Menendez From the Off. of U.S. Senator v. Wells, 204 N.J. 79, 131 (2010). Instead, we consider whether the doctrine comports with the State Constitution.

40

B.

1.

In our federalist system, state constitutions can be a source of more expansive individual liberties than what the Federal Constitution confers. See Pruneyard Shopping Ctr. v. Robins, 447 U.S. 74, 81 (1980); State v. Novembrino, 105 N.J. 95, 144-45 (1987); see also Stewart G. Pollock, State Constitutions as Separate Sources of Fundamental Rights, 35 Rutgers L. Rev. 707 (1983) (throughout); William J. Brennan, Jr., State Constitutions and the Protection of Individual Rights, 90 Harv. L. Rev. 489 (1977) (throughout); Jeffrey S. Sutton, 51 Imperfect Solutions: States and the Making of American Constitutional Law 7-10, 16-21 (2018).

On a number of occasions, this Court has found that the New Jersey Constitution "affords our citizens greater protection against unreasonable searches and seizures" than the Fourth Amendment does. Novembrino, 105 N.J. at 145 (citations omitted); e.g., State v. Earls, 214 N.J. 564, 588 (2013) (requiring a search warrant for cell phone location data); State v. Reid, 194 N.J. 386, 389 (2008) (recognizing a reasonable expectation of privacy in internet subscriber information); State v. McAllister, 184 N.J. 17, 19 (2005) (finding a reasonable expectation of privacy in bank records); State v. Carty, 170 N.J. 632, 635 (2002) (requiring officers to have a reasonable and

41

articulable suspicion of criminal activity before they may request consent to search a car stopped for a motor vehicle infraction), modified on other grounds, 174 N.J. 351 (2002); State v. Mollica, 114 N.J. 329, 344-45 (1989) (finding a privacy interest in hotel-room telephone toll or billing records); State v. Johnson, 68 N.J. 349, 353-54 (1975) (requiring the State to prove that a person has "knowledge of the right to refuse consent" to establish consent to search).

The Court's decision in Novembrino followed the same principle in declining to adopt a good-faith exception to the exclusionary rule under the State Constitution. 105 N.J. at 157-59. The ruling departed from United States v. Leon, 468 U.S. 897 (1984), which established the exception under federal law.

The Novembrino Court's decision to find stronger protections under the State Constitution was "strongly influenced by . . . the likely impact of [the ruling] on the privacy rights of our citizens and the enforcement of our criminal laws." Id. at 146. As the Court explained,

> [t]he exclusionary rule . . . has become an integral element of our state-constitutional guarantee that search warrants will not issue without probable cause. Its function is not merely to deter police misconduct. The rule also serves as the indispensable mechanism for vindicating the constitutional right to be free from unreasonable searches. Because we believe that the good-faith exception to the exclusionary rule adopted

42

in <u>Leon</u> would tend to undermine the constitutionally-guaranteed standard of probable cause, and in the process disrupt the highly effective procedures employed by our criminal justice system to accommodate that constitutional guarantee without impairing law enforcement, we decline to recognize a good-faith exception to the exclusionary rule.

[<u>Id.</u> at 157-58 (footnote omitted).]

2.

In Roman-Rosado's appeal, which implicates the federal reasonable mistake of law doctrine outlined in <u>Heien</u>, the State argues that officers should not be penalized for mistakenly interpreting laws that are less than clear. But that argument begs another question: should individuals stopped for a supposed "offense" that is not a crime be penalized under the New Jersey Constitution?

The State Constitution favors the protection of individual rights and is designed to vindicate them. Under our Constitution, people have the right to be free from unreasonable searches and seizures, and they suffer real harm when their rights are violated. The key issue under New Jersey's Constitution, then, is not whether an officer reasonably erred about the meaning of a law. It is whether a person's rights have been violated.

The protections against unreasonable searches and seizures guaranteed by Article I, Paragraph 7 encompass a simple notion -- that an actual law the

43

police are obligated to enforce may have been violated. Within that broad frame, there is room for debate about whether certain behavior amounts to reasonable suspicion or probable cause to believe that a crime has been committed. But no one would argue it is reasonable for the police to stop someone for violating a hypothetical law or a law that was never enacted. Just the same, it is not reasonable to restrict a person's liberty or invade their privacy for behavior that no statute condemns.

An officer's reasonable but mistaken interpretation of a statute cannot change the fact that the law does not criminalize particular conduct. In other words, if a law does not establish an offense altogether, the reasonable nature of an officer's mistake cannot transform an officer's error into reasonable suspicion that a crime has been committed. If officers could search and seize a person under those circumstances, reasonable, good faith errors would erode individual rights that the State Constitution guarantees.

At its core, the State Constitution stands for critical principles such as the rule of law and equal justice under the law. Those concepts encourage the uniform and fair enforcement of a system of laws. To be faithful to those ideals, we depend on legislators to craft clear statutes. We call on officers to learn the law in advance and enforce it correctly. And we count on judges to

44

interpret and uphold laws as written -- not to validate an officer's mistaken view of the law, even if reasonable, that intrudes on a person's liberty.

Such an approach does not penalize law enforcement officers. Although they may need to make difficult judgment calls when enforcing laws that are not entirely clear, they suffer no penalty if they make a reasonable mistake. See Heien, 574 U.S. at 75 (Sotomayor, J., dissenting). That cannot be said of individuals who are stopped or searched based on a mistaken interpretation of the law. They cannot tailor their behavior in advance to abide by what an officer might reasonably, but mistakenly, believe the law says. And if they are then stopped -- without notice -- for conduct that no law proscribes, they suffer real harm.

Courts in several other states have likewise declined to adopt Heien's reasonable mistake of law exception under their state constitutions. See State v. Coleman, 890 N.W.2d 284, 298 n.2 (Iowa 2017) (stating that the Court's prior holding rejecting the reasonable mistake of law doctrine "under the Iowa Constitution is unaffected by Heien"); State v. Pettit, 406 P.3d 370, 375-76 (Idaho Ct. App. 2017) ("[T]he Court declines to follow Heien . . . and adopt a good faith exception for an officer's objectively reasonable mistake of law.");

State v. Carson, 404 P.3d 1017, 1019 n.2 (Or. Ct. App. 2017) ("declin[ing] the state's invitation to revisit [the court's] prior holdings" and follow Heien).[4]

We therefore decline to adopt a reasonable mistake of law exception under the New Jersey Constitution.

C.

Under the exclusionary rule, evidence seized as a direct result of the State's unconstitutional action must be suppressed. Wong Sun v. United States, 371 U.S. 471, 485 (1963); State v. Bryant, 227 N.J. 60, 71 (2016). The seizure of the handgun in Roman-Rosado's case -- following an unjustified car stop -- must therefore be suppressed.

In light of our disposition of the above issues, we need not decide whether the officers had a basis to conduct a protective sweep.

VI.

For the reasons set forth above, we modify and affirm the judgments in both cases.

---

[4] Prior to Heien, at least five state supreme courts and five U.S. Courts of Appeals "held that police mistakes of law are not a factor in the reasonableness inquiry." See Heien, 574 U.S. at 74 n.1 (Sotomayor, J., dissenting) (collecting cases). A number of states have since adopted the Supreme Court's holding in Heien. See Sutherland, 231 N.J. at 441 (collecting cases). Others have followed or acknowledged Justice Kagan's narrower interpretation. See id. at 442 (collecting cases).

JUSTICES LaVECCHIA, ALBIN, PATTERSON, FERNANDEZ-VINA, SOLOMON, and PIERRE-LOUIS join in CHIEF JUSTICE RABNER's opinion.

Appendix A



48